**STATE of Minnesota, Respondent,**

v.

**Kenneth Eugene ANDERSEN, Appellant.**

**No. A08–1521.**

Supreme Court of Minnesota.

June 30, 2010.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN; and Michael Fritz, Becker County Attorney, Detroit Lakes, MN, for respondent.

Theodora Gaïtas, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

This appeal arises out of the murder of 34-year-old Chad Swedberg. A Becker County jury found appellant Kenneth Andersen guilty of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2008), for the shooting death of Swedberg. Andersen makes several arguments on appeal: (1) the search-warrant application contained material misrepresentations and did not otherwise provide probable cause; (2) the evidence was insufficient for a conviction of first-degree premeditated murder; (3) the State should be required to show that evidence from trial did not derive from monitoring and recording of Andersen's phone conversations with his attorney. In a pro se supplemental brief, Andersen also argues that the district court committed plain error in its questioning of certain jurors about incidents outside the courtroom. We affirm.

Swedberg lived with his wife, Leslie Fain, in rural Becker County. A number of Fain's relatives also lived with Swedberg and Fain: her son, Jesse Fain; Jesse's wife and their three children; and Leslie Fain's sister and nephew. Ken Swedberg, Swedberg's older brother, lived nearby with his wife and their three children.

The morning of the murder, April 13, 2007, Swedberg planned to process maple syrup with the help of his friend Albert Baker and Jesse Fain. The plan was for Swedberg to arrive at the syruping camp earlier than Baker and Jesse Fain in order to cut wood to fuel the evaporator and have the camp ready by the time the others arrived later in the morning. Swedberg was delayed and left the house around 8 a.m.

Shortly after Swedberg's departure, Leslie Fain heard two loud gunshots from

the approximate direction of the syruping camp. This concerned her because it was not hunting season and she thought there was no reason for gunshots in that area. Fain called Swedberg's cell phone after hearing the gunshots. Although she was not sure exactly what time she heard the shots, she testified that after hearing the shots she immediately began to look for her cell phone to call her husband. Her first call to Swedberg was at 8:13 a.m. There was no answer. She subsequently called him at 8:15, 8:27, 8:45, and 8:56 a.m.; he did not answer any of these calls. Fain was worried because she had heard gunshots and Swedberg was not answering his phone. She got ready to go to work and then tried calling him one more time.

When there was again no answer, Fain walked down the trail to the syruping camp and found Swedberg lying motionless on the ground. No blood or gunshot wounds were immediately visible. Fain called Swedberg's brother, Ken Swedberg, at 9:55 a.m. and then called 911 at 9:57 a.m. She initially called Ken Swedberg because she thought the emergency personnel would not be able to find the location of Swedberg's body without assistance.

White Earth Tribal Police Officers Scott Brehm and Nicholas Stromme arrived a minute or two after 10:00 a.m. Ken Swedberg met them at the residence and told them that his brother was dead and his body was about 1,000 yards down the trail. The officers used Ken's all-terrain vehicle to get to the homicide scene, as the path was muddy and difficult to navigate. The officers found Fain crying and screaming. She pointed to her husband's body near the cooker that he used to process his maple syrup. Officer Brehm, as he was checking the body for signs of life, did not notice any blood. Fain told the officers that she went looking for her husband after hearing two gunshots and repeatedly failing to reach him on his cell phone. Brehm and Stromme then examined under Swedberg's coat and shirt and noticed blood on Swedberg's right side. Two emergency medical technicians arrived at 10:11 a.m.

The crime scene yielded little physical evidence despite extensive investigation. Four trails led to and from the clearing: one to the east, one to the south, one to the northwest, and one to the north. On the northbound trail, a Becker County investigator that had arrived at the scene, Officer John Sieling, saw what he believed to be two tracks of footprints in the frost, one track going north and the other going south toward the murder scene.[1] Ken Swedberg and Captain Joseph McArthur, a Becker County deputy sheriff who had arrived at the Swedberg residence, drove around looking for tracks. They did not find anything significant, other than some evidence of foot traffic believed to be from Swedberg. They also walked across Fish Hook Lake, looking for tracks.

The medical examiner testified that Swedberg was shot twice—once in the back of the right shoulder and once in the left buttock. The examiner determined that the gunshot wounds caused Swedberg to bleed to death within a matter of minutes. The lack of any stippling or gunpowder around the wounds led the examiner to believe that Swedberg had not been shot at close range. A firearms examiner determined that the bullets removed from Swedberg's body came from a .30–caliber weapon. The examiner was "reasonably certain" that the bullets were Winchester Supreme Ballistic Silvertips, but, because

---

1. No photographs of the footprints were taken, in part because of technical problems but also because there was concern that the perpetrator might still be in the area. As the sun moved higher in the sky, the footprints disappeared.

of damage to the bullets, was not able to positively identify or determine the weight of the bullets.

Investigators spoke with appellant, Kenneth Andersen, a few days after Swedberg's death. Andersen was not a suspect at that point. Swedberg and Andersen had grown up together and were described by some as best friends. On August 17, 2006, while Swedberg and Andersen were constructing a pole building in Roseau County, there was a reported theft of an all-terrain vehicle (ATV) from the residence where Swedberg and Andersen were working. At some point, Andersen confessed to Swedberg and Andersen's step-nephew that Andersen had stolen the ATV. In mid-November 2006 the Becker County Sheriff's Department located the stolen ATV behind Swedberg's residence. Further investigation revealed that the stolen ATV was registered to Andersen's mother. Swedberg denied any knowledge of the ATV to police and called Andersen while an investigator was listening and then handed the phone to the investigator. Andersen was charged with the theft of the ATV and Swedberg was unhappy that the ATV was found near the Swedberg residence.

Swedberg decided that he did not want to continue working with Andersen; Swedberg and Fain agreed that Swedberg would look for a different job. Swedberg told Jesse Fain that Swedberg intended to stop working with Andersen. Approximately one week before Swedberg's death, Swedberg also decided not to participate with Andersen in a leeching business.

Andersen used his cell phone to call Swedberg at 7:46 a.m. on April 13, 2007, the day of the murder. He told police he called Swedberg looking for a ride to Fargo in order to apply for a loan, but Swedberg declined because Swedberg and Baker intended to make maple syrup that morning. Andersen used his cell phone to call Baker at 7:52 a.m. and asked Baker to stop by on his way to Swedberg's residence to look at a tank Andersen wanted to use to store leeches. Baker agreed but wanted to buy groceries first. Andersen claimed that Baker was supposed to be at his house by 8:30 a.m., but Baker testified that Andersen knew Baker needed to go to Waubun to get groceries first and that Andersen did not set any specific time to arrive at Andersen's home.

Andersen told police that he had a tax preparer's appointment at 9:00 or 9:30 that morning and an appointment with a banker at 11:00 a.m., and that he left for the appointments between 8:30 and 9:00 a.m. But, Andersen first called his cousin a little before 9:17 a.m. to ask for a ride to Fargo. Andersen's cousin agreed to drive Andersen to Fargo; at 9:34 a.m. Andersen again contacted his cousin, while his cousin was en route, and asked his cousin to meet him at Andersen's sister's house, which was on the way to Andersen's house. Andersen's cousin did so and he and Andersen left for Mahnomen to meet with Andersen's tax preparer.

Andersen arrived at his tax preparer's sometime between 9:45 and 10:00 a.m. Andersen's appointment was not at 9:00 or 9:30 a.m., as he claimed, but rather at 2:00 p.m. that day. It was common for Andersen to arrive very early or very late for appointments. After meeting with his tax preparer, Andersen went to Moorhead to attempt to obtain a loan. He did not have an appointment for that day as he told the police, but rather was supposed to meet with the branch manager of a financial institution on April 12, 2007. While Andersen was meeting with the branch manager, his cell phone rang and he answered it. After the phone conversation, he told the branch manager that his business partner had been shot and he had to leave.

But when Andersen returned to his cousin, who was waiting in the vehicle, Andersen told him that Swedberg's brother, Ken Swedberg, had been shot. This was inconsistent with Andersen's statement to the branch manager because Ken Swedberg was not Andersen's business partner. Andersen told police that his niece told him that Ken Swedberg had been shot, and that she called a second time shortly thereafter and told Andersen that Ken Swedberg was dead. But Andersen's niece maintained she only spoke to Andersen once, and she told Andersen that Swedberg had been shot, not Ken Swedberg. On the day of Swedberg's funeral, Andersen opened a bank account and told the bank manager yet another story about what happened the day of the murder, namely, that Andersen had stopped by Swedberg's home to see if Swedberg wanted to go to South Dakota to buy leech traps.

On September 18, 2006, well before the murder, Swedberg bought Andersen a Tikka T3 Lite .300 Winchester short magnum rifle and a Nikon Buckmaster rifle scope at Reed's Sporting Goods store in Walker, Minnesota. When police asked Andersen about this rifle, Andersen claimed that Swedberg had traded it in for two muzzleloaders on November 23, 2006.[2] The Tikka rifle Swedberg bought for Andersen, however, was found later that day concealed under the insulation of an outbuilding near Andersen's house. Andersen's palm print was found on the gun. Officers testified that Andersen also acted suspiciously during the execution of the search warrant that ultimately led to the discovery of the rifle Swedberg bought for Andersen. The police did not initially tell Andersen they had a search warrant and

Andersen consented to the search of his house. When police were proceeding to search the outbuildings, however, Andersen became angry and said his brother, Frank, owned those buildings and said Frank did not want the police searching the buildings. Frank, however, had only said to Andersen that Frank did not want his house searched without a warrant.

The firearms examiner test-fired the Tikka rifle found in the outbuilding and concluded that because of the absence of unique marks it was not possible to definitively say that the Tikka rifle fired the bullets removed from Swedberg's body, but the Tikka rifle could have fired the bullets removed from Swedberg's body. The examiner also concluded that bullets found in Andersen's house during the search had characteristics similar to the bullets removed from Swedberg's body.

The jury found Andersen guilty of first-degree premeditated murder and this appeal followed.

## I.

Andersen first argues that the district court erred when it failed to suppress the evidence found in the search of his property. Andersen claims there were material misrepresentations and omissions of fact in the search-warrant application and that without these misrepresentations and omissions of fact the application did not supply probable cause. The State argues that the contested representations and omissions were not material because even when the contested representations are set aside and the omissions are included, the application still supplied probable cause to support the search warrant.

**2.** Andersen offered several different possible locations where the Tikka rifle had supposed-
ly been exchanged for the two muzzleloaders.

We have said that "[a] search warrant is void, and the fruits of the search must be excluded, if the application includes intentional or reckless misrepresentations of fact material to the findings of probable cause." *State v. Moore,* 438 N.W.2d 101, 105 (Minn.1989) (discussing and applying the two-prong test developed in *Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and *State v. Causey,* 257 N.W.2d 288, 291–92 (Minn.1977)). When a defendant seeks to invalidate a warrant, the two-prong *Franks* test requires a defendant to show that (1) the affiant "deliberately made a statement that was false or in reckless disregard of the truth," and (2) "the statement was material to the probable cause determination." *State v. McDonough,* 631 N.W.2d 373, 390 (Minn.2001). A misrepresentation or omission is material if, when the misrepresentation is set aside or the omission supplied, probable cause to issue the search warrant no longer exists. *State v. Mems,* 708 N.W.2d 526, 532 (Minn.2006); *State v. Doyle,* 336 N.W.2d 247, 252 (Minn. 1983).

Although we have generally stated that a district court's findings will not be set aside unless they are clearly erroneous, *see McDonough,* 631 N.W.2d at 390, we have not squarely addressed the review standard to be applied to a district court's analysis of the two-prong *Franks* test. Several federal courts have held that the issue of whether an affiant deliberately made statements that were false or in reckless disregard of the truth involves a fact-based question that is reviewed under the clearly erroneous standard, and the issue of materiality presents a mixed question of law that is reviewed under the de novo standard. *See, e.g., United States v. Awadallah,* 349 F.3d 42, 65 (2d Cir.2003); *United States v. Elkins,* 300 F.3d 638, 649 (6th Cir.2002); *United States v. Bertrand,* 926 F.2d 838, 842–43 (9th Cir.1991); *United States v. Page,* 808 F.2d 723, 729 (10th Cir.1987). Because the analysis of federal courts is well reasoned, we conclude that the clearly erroneous standard controls our review of a district court's findings on the issue of whether the affiant deliberately made statements that were false or in reckless disregard of the truth.[3] We also conclude that the de novo standard controls our review of a district court's determination of whether the alleged misrepresentations or omissions were material to the probable cause determination.

The district court denied Andersen's motion to suppress, explaining that the search warrant was valid because the alleged misrepresentations and omissions in the search-warrant application were not material. We agree.

Most of the alleged misrepresentations and omissions in the search-warrant application for Andersen's property center around statements made about various weapons Andersen owned. The search-warrant application stated that Andersen's step-nephew had sold Andersen "a Tikka brand, 300 Short Mag, bolt action rifle." Before the search-warrant application was drafted, however, the affiant had confirmed, but did not include in the application for the warrant, that the Tikka rifle sold to Andersen by his step-nephew had been pawned prior to the murder.

The search-warrant application also stated that a taxidermist told one officer that Andersen told the taxidermist he shot a

---

**3.** In at least one of our previous cases, we have applied the clearly erroneous standard of review to findings on whether an affiant deliberately made statements that were false or in reckless disregard of the truth. *See State v. Randa,* 342 N.W.2d 341, 343 (Minn. 1984).

fisher "with a 300 Short Mag rifle." But the taxidermist also told the affiant that Andersen had said he shot the fisher with a .222 rifle, which is what Andersen told police. The taxidermist's statement about a .222 rifle was not included in the search-warrant application.

Andersen argues that the remaining allegations in the search-warrant application did not connect Andersen to a Tikka rifle or any other .30–caliber weapon. We disagree. There were two different Tikka rifles referenced in the application: one that Andersen bought from his step-nephew (and which was later pawned) and one that Swedberg purchased for Andersen. Andersen argues that the information provided about the Tikka rifles in the search-warrant application was not sufficient to show he owned a Tikka rifle. Although it is not always clear which gun is referred to in the search-warrant application, there are several references in the application to the rifle that Swedberg purchased for Andersen.

The search-warrant application states that, according to an interview with Andersen's brother, Andersen purchased a "300 mini-mag" at Reed's Sporting Goods sometime in 2006.[4] The application noted that although no records were found indicating that Andersen had purchased a firearm from Reed's, records confirmed that on September 18, 2006, Swedberg purchased a "Tikka brand, 300 Short Mag caliber" rifle at Reed's Sporting Goods. The application states that Fain remembered Swedberg telling her that Andersen wanted Swedberg to purchase a rifle for Andersen, as Andersen was a convicted felon and could not do so himself. Although Fain could not recall Swedberg telling her that he actually made the purchase for Andersen, she did not believe Swedberg purchased the rifle for himself because he had

to borrow a rifle for an elk hunt in October 2006. Andersen argues that because Fain could not remember if Swedberg had purchased the rifle for Andersen, this renders the search-warrant application insufficient. But in making this argument Andersen ignores the other statements in the application about this gun.

Andersen argues that "[a] careful review of the search-warrant application reveals that it was precisely drafted to suggest that . . . the rifle that was sold to [Andersen by Andersen's step-nephew] and ultimately pawned before the murder—was the suspected murder weapon." But the rifle sold to Andersen by his step-nephew is not mentioned until two pages after the Tikka rifle Swedberg purchased for Andersen is discussed. Thus, while the affiant could have identified the Tikka rifle sold to Andersen by his step-nephew as having been pawned before the murder, there were substantial allegations that Andersen owned another .30–caliber Tikka rifle at the time of the murder that was not the gun Andersen had purchased from his step-nephew. Even with the addition of the fact that one Tikka rifle was pawned before the murder and that the taxidermist said Andersen claimed to have used a different type of firearm than the taxidermist had previously stated, there was a fair probability that evidence of a crime would be found on Andersen's property (i.e., a rifle like that used to commit the murder). *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Andersen also argues that the search-warrant application improperly states that the bullets found in Swedberg were "identified" as .30–caliber rounds marketed under the Winchester brand as Supreme Ballistic Silvertip bullets when the firearms

---

4. The other Tikka rifle was pawned in 2005 or 2006.

examiner's report only stated that the bullets found in Swedberg were *consistent* with that type of bullet. But later in the application, the affiant refers to the fact that the Winchester Supreme bullets are "consistent with the bullets recovered from the body of Chad Swedberg." Thus, the affiant did use the correct terminology at least once.

Andersen also argues that the search-warrant application improperly characterized the evidence found by Captain McArthur and Ken Swedberg. The search-warrant application states that Captain McArthur found "possible evidence of foot traffic" and later refers to the "possible footprints discovered by Captain McArthur." The affiant did not include the fact that Ken Swedberg saw only a heel print and believed the heel print was from his brother. Andersen objects to the use of the term "footprints" when there was only a heel print. These arguments are unavailing.

The search-warrant application clearly says *possible* footprints, which would indicate to a prudent reader that the tracks were not well-defined or of strong evidentiary value. In addition, the affiant testified at the omnibus hearing that he did not include the information about Ken Swedberg's belief that the footprints belonged to Swedberg, but the affiant also omitted that Ken Swedberg stated that Swedberg and Andersen wore the same type of boots. The inclusion of both of these omissions would have no impact on the probable cause determination. Finally, the bulk of the search-warrant application focused on firearms, not possible footprints.

While greater care in assembling the application would have been preferable, we do not believe that any of the alleged misrepresentations or omissions were material to the probable cause determination. We conclude that the application estab-

lished probable cause to justify issuance of the search warrant. We therefore do not need to determine if the alleged misrepresentations or omissions were deliberate or reckless. *See Causey,* 257 N.W.2d at 291–93.

## II.

 Andersen argues that there was insufficient evidence to convict him of first-degree murder. Recently, in *State v. Stein,* we addressed the standard of review in circumstantial evidence cases. 776 N.W.2d 709, 714 (Minn.2010) (plurality opinion). In a three-justice plurality opinion, we said that when reviewing the sufficiency of circumstantial evidence, "our first task is to identify the circumstances proved." *Stein,* 776 N.W.2d at 718 (plurality opinion). In identifying the circumstances proved, "we defer, consistent with our standard of review, to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* Juries are generally "in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony." *State v. Hughes,* 749 N.W.2d 307, 312 (Minn.2008). Our second step is to "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved"; this includes inferences consistent with a hypothesis other than guilt. *Stein,* 776 N.W.2d at 716 (plurality opinion). In other words, "all the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt." *State v. Johnson,* 173 Minn. 543, 545, 217 N.W. 683, 684 (1928). Unlike the deference we give when reviewing circumstances proved, "we give no deference to the fact finder's

choice between reasonable inferences." *Stein,* 776 N.W.2d at 716 (plurality opinion). "In assessing the inferences drawn from the circumstances proved, the inquiry is not simply whether the inferences leading to guilt are reasonable. Although that must be true in order to convict, it must also be true that there are no other reasonable, rational inferences that are inconsistent with guilt." *Id.* Stated another way, the circumstances proved must be consistent with guilt and inconsistent with any rational hypothesis except that of guilt. But "[w]e will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998). The State does not have the burden of removing all doubt, but of removing all reasonable doubt. *Hughes,* 749 N.W.2d at 313. We conclude that this is the proper approach in analyzing sufficiency of the evidence claims in circumstantial evidence cases and adopt it as our standard.

██ Here, when taken in a light most favorable to the State, the evidence proves the following circumstances. Shortly before the murder, Andersen and Swedberg's relationship had deteriorated. Swedberg no longer wanted to work with Andersen in construction. Approximately one week before Swedberg's death, Swedberg changed his mind and decided not to participate with Andersen in a leeching business. Andersen used his cell phone to call Swedberg at 7:46 a.m. on the day of the murder. Swedberg informed Andersen that Swedberg was going to make maple syrup with Baker that morning, so Andersen knew Swedberg would be at the syruping camp that morning. Andersen then used his cell phone to call Baker at 7:52 a.m. and asked Baker to drive to Andersen's house in order to look at a leech tank. Baker agreed to drive to Andersen's before going to the syruping

camp. Baker informed Andersen that he needed to buy groceries. Thus, Andersen was aware that Baker was not going to the syruping camp until later. Andersen was generally familiar with the area around Swedberg's syruping camp; Andersen had visited the syruping camp before and hunted in the surrounding woods. Andersen lived approximately 1.3 miles away from the syruping camp.

Swedberg left his house to go to the syruping camp shortly after 8:00 a.m. After Swedberg left, Fain heard two gunshots, became worried, and called Swedberg's phone at 8:13, 8:15, 8:27, and 8:45 a.m., but Swedberg did not answer her calls. Swedberg was shot between 8:00 and 8:13 a.m.

Andersen made false statements to police about his whereabouts around the time Swedberg was shot. Andersen told police he met his cousin at his cousin's house between 8:30 and 9:00 a.m. in order to go to a 9:00 or 9:30 a.m. appointment with a tax preparer, but in fact he did not leave for the appointment until after 9:30 a.m. when Andersen arranged to have his cousin pick him up at Andersen's sister's house. But Andersen's appointment was actually scheduled for 2:00 p.m., not 9:00 or 9:30 a.m.

Andersen also made false statements about his ownership and possession of the Tikka T3 Lite .300 Winchester short magnum rifle, which shoots .30–caliber bullets. At a time when the general public believed that Swedberg had been shot with a smaller caliber gun because of information provided by the police, Andersen nevertheless attempted to mislead the police concerning his ownership and possession of the Tikka rifle, but he did not try to conceal his ownership of other guns. Further, Andersen initially gave consent to the police to search his house, but later when the police were about to search the out-

buildings, Andersen became angry and objected. He made another false statement to police by telling them that his brother Frank did not want the police to search the outbuildings. The Tikka T3 Lite .300 Winchester short magnum rifle, capable of firing the type of bullets that killed Swedberg, was found concealed in the insulation of an outbuilding on Andersen's land. Andersen's palm print was on the gun. Bullets found in Andersen's house had characteristics similar to the bullets recovered from Swedberg's body.

We must next determine whether the reasonable inferences that can be drawn from the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than Andersen's guilt. *See Stein,* 776 N.W.2d at 718 (plurality opinion).

Andersen makes several arguments in support of his claim that the State failed to meet its burden of proof that he was the shooter. He argues that the timeline of events supports a reasonable inference that he could not have been the shooter, particularly given the distance between his home and the syruping camp and that "it would have been difficult for [Andersen] to kill [Swedberg] and then return to his normal business." But Andersen only lived approximately 1.3 miles from the syruping camp. The circumstances proved establish that Andersen used his cell phone to call Swedberg at 7:46 a.m. and Baker at 7:52 a.m. Swedberg was shot sometime between 8:00 and 8:13 a.m. The jury was free to reject the assertion that Andersen was at his home when he used his cell phone to call Swedberg at 7:46 a.m. and Baker at 7:52 a.m. Further, although Andersen used his cell phone to call his sister at 8:34 a.m. from an unknown location, we must assume the jury believed the State's evidence that Andersen's whereabouts could not be accounted for until he

arrived at his sister's house around 9:30 a.m. Thus, the circumstances proved do not reflect a timeline of events that would support a reasonable inference that Andersen could not have been the shooter.

Andersen also argues that the State's evidence did not convincingly rule out Baker or Ken Swedberg as perpetrators in the murder of Swedberg. But we must assume that the jury found that at the time Swedberg was shot, Baker was at home or picking up groceries and Ken Swedberg was making food for his bees with his wife and working in his garage. Once these facts are accepted as true, they do not support a reasonable hypothesis that Baker or Ken Swedberg was the shooter.

 Andersen argues that the State did not convincingly demonstrate a motive. The State, however, is not required to prove motive. *See State v. McArthur,* 730 N.W.2d 44, 49–50 (Minn.2007). Nonetheless, the relationship between Swedberg and Andersen had deteriorated and Swedberg had recently decided to end his business relationship with Andersen.

Andersen also suggests alternative reasons why he might have concealed the Tikka rifle in the insulation of an outbuilding, other than the fact that it was the murder weapon. For instance, Andersen claims that he may have hidden the Tikka rifle in fear when it became apparent that the investigation of Swedberg's death was focusing on Andersen. But the circumstances proved establish that Andersen attempted to conceal his ownership of the rifle before the general public knew that a .30–caliber rifle was used to kill Swedberg. Andersen did not attempt to conceal ownership of other guns when he spoke with police. Further, Andersen became angry when the police started searching outbuildings on the property where the rifle was ultimately found, and he objected to the search of the outbuildings when he had

given consent for his house to be searched. The only rational hypothesis to be drawn from this is that Andersen hid the rifle because he did not want the police to find that particular firearm.

Finally, Andersen argues that the lack of physical evidence, such as footprints, around the crime scene, coupled with the timeframe during which Andersen would have had to walk to the syruping camp area and back, indicates that he could not have committed the murder without leaving any evidence. But as discussed above, the tight timeframe on which Andersen relies is not part of the circumstances proved. In addition, Sieling testified that he saw what he believed to be two tracks of footprints in the frost on a trail leading to the north and west of the syruping camp in the general direction of Andersen's house; one track went south toward the murder scene and one track went north. Because the other investigators who were looking for tracks noticed that they were not leaving any tracks, the absence of tracks is of no probative value when there is no doubt that the killer was present at the murder scene. Therefore, the lack of footprints around the crime scene is not inconsistent with Andersen's guilt, or consistent with his innocence.

■ Andersen's footprint argument, along with his other arguments, attempts to break the evidence into discrete pieces in an effort to establish that, when viewed in isolation, these evidentiary fragments support a reasonable hypothesis other than guilt. But we do not review each circumstance proved in isolation. Instead, we must consider whether "the circumstances presented are consistent with guilt and inconsistent, *on the whole*, with any reasonable hypothesis of innocence." *State v. Curtis*, 295 N.W.2d 253, 258 (Minn.1980) (emphasis added). Andersen was an experienced hunter and outdoors-man who had a Tikka T3 Lite .300 Winchester short magnum rifle that he falsely denied owning and attempted to hide from the police. Further, Andersen created for himself the opportunity to kill Swedberg when Andersen asked Baker to come to his house and confirmed that Baker would not be at the syruping camp right away. Moreover, shortly after the time of the murder, Andersen took steps to ensure that he would be out of the area by getting a ride out of town, and he repeatedly made false statements to police in an attempt to create an alibi. Thus, the reasonable inferences that can be drawn from the circumstances proved are consistent with Andersen being the killer and inconsistent with any other rational hypothesis.

Andersen next argues that even if the State produced enough evidence to demonstrate that he was the killer, it did not produce sufficient evidence to prove premeditation. We consider evidence about planning, motive, and the manner of killing when considering whether there was sufficient evidence to prove premeditation. *McArthur*, 730 N.W.2d at 49–50. Andersen argues that the act of carrying a rifle into the woods would not be sufficient to establish premeditation, as it is common for residents of the area to take firearms into the woods. But the circumstances proved include more than an act of carrying a rifle into the woods. The circumstances proved also include the fact that Andersen arranged to delay Baker so that he would not be there when Andersen shot Swedberg and that Andersen was lying in wait for Swedberg. Accordingly, the circumstances proved not only support a reasonable inference that Andersen shot Swedberg with premeditation, they do not support a rational hypothesis that Andersen shot Swedberg without premeditation. We conclude that there was sufficient evi-

dence to convict Andersen of first-degree premeditated murder.

## III.

■ Andersen contends that his constitutional right to counsel was violated when his phone calls to his attorney's cell phone were monitored and recorded. He argues that it is nearly impossible for him to prove that the prosecution listened to these calls and obtained prejudicial information from the calls. Consequently, he asks us to remand the case for a hearing at which the State should be required to prove that none of the evidence introduced by the State was obtained, either directly or indirectly, from these calls. The State argues that because none of the investigators listened to any of these recordings, but rather stopped listening as soon as they realized the calls were to an attorney, there was no prejudice and a remand is not necessary.

A defendant has a constitutional right to counsel.[5] U.S. Const. amends. VI, XIV; Minn. Const. art. I, § 6. The attorney-client privilege is a statutory right, Minn. Stat. § 595.02, subd. 1(b) (2008), not a constitutional right. *See Maness v. Meyers*, 419 U.S. 449, 466 n. 15, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir.1985). But in some situations government interference with the confidential relationship between a defendant and his counsel may implicate the constitutional right to counsel. *See, e.g., Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

In *Weatherford*, the United States Supreme Court held that an intrusion into the attorney-client relationship, standing alone, does not, as a matter of law, constitute a violation of the Sixth Amendment.

429 U.S. at 558, 97 S.Ct. 837. In *Weatherford*, the allegedly aggrieved party failed to show that (1) evidence used at trial was produced directly or indirectly by the intrusion, (2) the intrusion by the government was intentional, (3) the prosecution received otherwise confidential information about trial preparations or defense strategy as a result of the intrusion, or (4) the overheard conversations and other information were used in any way to the substantial detriment of the claimant. *Id.* at 554, 558, 97 S.Ct. 837. The federal courts of appeals agree that a defendant claiming a violation of the right to counsel must show something in addition to an intrusion, but have differing views on the required factors and how to apply them. *See, e.g., United States v. Roper*, 874 F.2d 782, 790 (11th Cir.1989) (holding that defendant had to prove that there was tainted evidence, or his defense strategy was communicated to the prosecution, or there was purposeful intrusion); *United States v. Singer*, 785 F.2d 228, 234 (8th Cir.1986) (concluding that a defendant must show that the state knowingly intruded into the attorney-client relationship and that the intrusion demonstrably prejudiced the defendant); *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir.1985) (concluding that if the intrusion was unintentional or intentional but justifiable, the defendant must show that there was a communication of privileged information to the prosecutor and prejudice resulting therefrom); *Clutchette v. Rushen*, 770 F.2d 1469, 1471–72 (9th Cir.1985) (analyzing each of the factors individually).

We have not articulated a standard that a defendant, or the State, must show to prevail on a claim that an intrusion into the attorney-client relationship amounted to a violation of the right to counsel. Even

---

**5.** Andersen does not claim that the State limited Andersen's access to his attorney. It is also undisputed that calls to and from Andersen's attorney's land line were not recorded.

if the act of recording, but not listening to, attorney-client phone conversations is an intrusion into the attorney-client relationship, such an intrusion does not automatically translate into a violation of a defendant's right to counsel.

■ The district court determined that there was no prejudice to Andersen based on the investigators' testimony at the omnibus hearing that they ceased listening to any call once it was determined the call was between Andersen and his attorney, and further, they did not hear anything relating to the case. In addition, the district court found there was no evidence that anyone else overheard anything relating to the case. We give great deference to a district court's findings of fact and will not set them aside unless clearly erroneous. *See State v. Stephenson,* 310 Minn. 229, 231, 245 N.W.2d 621, 623 (1976). Findings of fact are clearly erroneous if, on the entire evidence, we are left with the definite and firm conviction that a mistake occurred. *Id.* at 231, 245 N.W.2d at 623; *State v. Evans,* 756 N.W.2d 854, 870 (Minn.2008). Our review of the record confirms that the findings made on this issue were not clearly erroneous. There is no indication that the intrusions were intentional, that evidence presented at trial was produced by the intrusions, that the prosecution received confidential information about trial preparations or defense strategy, or that any information in the calls was used in any way to Andersen's detriment.[6] We need not, and do not, articulate a standard that a defendant, or the State, must show to prevail on a claim that an intrusion into the attorney-client relationship amounted to a violation of the right to counsel because we conclude that

based on the district court's factual findings, Andersen's claim fails under all of the standards discussed above.

## IV.

■ Andersen makes several additional claims in his pro se brief. Andersen first argues that there was not sufficient evidence to convict him of first-degree murder. These arguments parallel those made on his behalf in this appeal and are addressed in Section II of this opinion. Andersen also argues that the district court committed plain error when it questioned various jurors, bailiffs, and witnesses about incidents that occurred outside of the trial. This argument is without merit for several reasons.

The first juror-related questioning involved juror N.K. and a co-worker of N.K. The co-worker, aware that N.K. was serving on a jury, asked him how it was going. N.K. replied that there was a lot of "controversy" about the case and "[t]his one says, this one says, this one says." The district court asked the co-worker if N.K. made any indication that the other jurors felt the same way or if there was any indication that N.K. had discussed this with other jurors. The co-worker responded in the negative.

The district court then questioned N.K. who claimed he never said anything beyond what could be found in the newspapers. In response to questions, N.K. indicated that the jurors sometimes, amongst themselves, would make comments about facial expressions, or that something seemed particularly important to an attorney. At no time did Andersen object to the questioning of the witness or juror. N.K. was dismissed without objection for

---

6. The recording of inmate calls to cell phones was a jail policy. There was no evidence that the recordings at issue here were anything but routine. Further, when the recording of

the calls came to the attention of the district court, the court ordered the cessation of recording of Andersen's calls to his attorney.

talking about the case outside of the courtroom.

Conduct that is not objected to at trial is reviewed under the plain-error standard. *See State v. Caine,* 746 N.W.2d 339, 349 (Minn.2008); *State v. Reed,* 737 N.W.2d 572, 583–84 (Minn.2007). Plain-error analysis is a three-prong test requiring the appellant to establish that there was (1) error, (2) that was plain and (3) that affected defendant's substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). If these three prongs are met, we then assess whether we "should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.*

We conclude that Andersen's substantial rights were not affected here. He argues that the State gained valuable insight into what the jurors were thinking. But both defense counsel and the State were present at the questioning and equally informed and knowledgeable about the incident. More importantly, questioning of the juror yielded very little information that was of real value. All that was gleaned was that at least one juror, ultimately dismissed, felt there was a lot of "controversy" in the case because there was contradictory testimony. Andersen does not specifically allege how the State could have changed, or did change, its presentation based on the information it learned. Thus, Andersen's substantial rights were not affected. Consequently, we need not, and do not, decide whether the district court committed an error that was plain.

After the incident with juror N.K., the court interviewed all the bailiffs to learn if they had observed any improper conversations between jurors. These interviews were done off the record. But after these interviews, the court stated on the record that none of the bailiffs indicated there were any concerns or that the bailiffs heard or saw anything that would have amounted to a violation of the court's order not to discuss the case. All attorneys agreed that was an accurate summary of what happened. Andersen now argues that something may have occurred during those interviews that would shed light on whether prejudice occurred because of juror misconduct. But Andersen has not alleged any specific information from those interviews that would be relevant. *See State v. Jackson,* 773 N.W.2d 111, 126 (Minn.2009) (citing *Schoepke v. Alexander Smith & Sons Carpet Co.,* 290 Minn. 518, 519–20, 187 N.W.2d 133, 135 (1971) ("An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection.")).

Finally, the district court interviewed a cousin of Andersen's and another juror, R.F., about a conversation that occurred between the two of them. According to Andersen's cousin, he saw R.F., a former co-worker, at a gas station during the trial. The cousin managed to deduce that R.F. was serving on Andersen's jury. When the cousin asked if R.F. was on that jury, R.F. replied that he could not talk about it. The cousin then told R.F. that Andersen was his cousin and to be good to him. R.F. once again responded that he was not allowed to speak about the matter. R.F. confirmed the cousin's account of the conversation and further stated he did not believe it would affect his ability to be fair. The State argued that R.F. should be excused. Andersen indicated that he did not want R.F. excused, and the juror continued to serve. Andersen now argues that R.F. might have shared this information with other jurors, and that this might have had a negative effect. But Andersen offers nothing to support this argument.

Once again, there is no indication that Andersen's substantial rights were affected. Consequently, we need not, and do not, decide whether the district court committed an error that was plain.

In sum, we have carefully reviewed Andersen's pro se arguments, and find them to be without merit.

Because we conclude that the district court properly rejected Andersen's challenge to the search warrant, that there was sufficient evidence to convict Andersen of first-degree premeditated murder, and that Andersen failed to establish any prejudice from the recording of phone calls to his attorney, we affirm his conviction.

Affirmed.

PAGE, Justice (concurring).

I concur in the result, but I write separately to note my disagreement with the court's statement of and application of our standard of review for convictions based on circumstantial evidence.

To the extent that the court's statement of and application of our standard of review for the sufficiency of the evidence in circumstantial evidence cases is inconsistent with Justice Meyer's articulation of the rule in *State v. Stein,* 776 N.W.2d 709, 720–26 (Minn.2010) (Meyer, J., concurring), I would follow the standard articulated by Justice Meyer. Juries may be in the best position to determine credibility and weigh the evidence, and we defer to their determination of the circumstances proved, but a jury's choice between reasonable inferences to be drawn from the circumstances proved is not entitled to deference.

In its decision here, the court ignores the fact that neither the timeline nor the physical evidence exclusively supports an inference of guilt. That is to say, the reasonable inferences that can be drawn from the timeline and physical evidence support a rational hypothesis other than guilt. Under our standard of review, "[c]ircumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Taylor,* 650 N.W.2d 190, 206 (Minn.2002); *see also State v. McArthur,* 730 N.W.2d 44, 49 (Minn.2007) (holding that when a conviction is based on circumstantial evidence, "that evidence must be consistent with the hypothesis that the accused is guilty and inconsistent with any other rational hypothesis except that of guilt") (citation omitted) (internal quotation marks omitted). In that the reasonable inferences from the timeline and physical evidence support a rational hypotheses other than guilt, the question becomes whether the evidence taken as a whole makes such theories seem unreasonable. *See Taylor,* 650 N.W.2d at 206 (stating that "possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable") (citations omitted) (internal quotation marks omitted). Although, on the record before us the answer to that question is a close one, I believe that the totality of the remaining evidence is sufficient to establish Anderson's guilt beyond a reasonable doubt.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Page.

MEYER, Justice (concurring).

I join in the concurrence of Justice Page.

MEYER, Justice (concurring).

I join in the concurrence of Justice Page but write separately to restate that the majority's analytical framework "unduly narrows our traditional standard of review for circumstantial evidence by replacing the term 'circumstantial evidence' with 'circumstances proved' and then restricting review of 'circumstances proved' to only those circumstances deemed by the court to be implicit in the guilty verdict." *State v. Stein*, 776 N.W.2d 709, 719 (Minn.2010) (Anderson, Paul H., J., concurring). Given that we are abandoning our traditional standard of review, I believe that trial courts should instruct the jury on the law of circumstantial evidence. Minnesota's pattern reasonable-doubt jury instruction tends to shift the burden of proof away from the State in prosecutions based on circumstantial evidence and fails to impress upon the jury the need to reach the requisite subjective state of certitude of guilt.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[1] *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The reasonable-doubt standard "impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *Id.* (citation omitted) (internal quotation marks omitted). "Minnesota's traditional circumstantial evidence standard incorporates the burden of proof in sufficiency review...." *State v. Tscheu*, 758 N.W.2d 849, 869 (Minn.2008) (Meyer, J., concurring).

*State v. Johnson*, the seminal authority cited for limiting review to circumstances implied in the verdict, involved the theft of 60 bushels of potatoes from a farmer's root cellar. 173 Minn. 543, 544, 217 N.W. 683, 683 (1928). The State's evidence was circumstantial. *Id.* at 544, 217 N.W. at 683. The defendant denied the theft and presented his own testimony and that of two others to establish an alibi. *Id.* at 544–45, 217 N.W. at 683. In affirming the conviction, this court noted that the credibility of defendant's witnesses and the weight of their testimony were for the jury. *Id.* at 545, 217 N.W. at 683–84. In regard to the circumstantial evidence, the court said:

> Various secondary rules relating to circumstantial evidence have been stated by the courts. Perhaps the most generally used rule is that all the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt. By the term "circumstances proved" is not meant every circumstance as to which there may be some testimony in the case, but only such circumstances as the jury finds proved by the evidence. There may well be in any case testimony

---

1. The *Winship* Court explained that historically,

 [t]he requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation. The demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, (though) its crystallization into the formula "beyond a reasonable doubt" seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt. 397 U.S. at 361 (citations omitted) (internal quotation marks omitted). For an analysis of the historical iterations of reasonable doubt, see generally Steve Sheppard, *The Metamorphoses of Reasonable Doubt: How Changes in the Burden of Proof Have Weakened the Presumption of Innocence*, 78 Notre Dame L.Rev. 1165, 1176–1223 (2003).

on behalf of the defendant as to inconsistent facts and circumstances, not conclusively proved, and which the jury may have a right to and do reject as not proved. Followed to its logical conclusion, the secondary rule stated reverts back to the reasonable doubt rule. For, if any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises.

*Id.* at 545–46, 217 N.W. at 684 (citation omitted).

When *Johnson* was decided, instructions on the law of circumstantial evidence were given to guide the jury in evaluating this evidence:

Such instructions, which place restrictions upon the jury's use of inculpatory circumstantial evidence, are given to protect the accused by confining the jury, in arriving at a verdict of guilt, to a reliance only upon such facts and circumstances as form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt. The need for protective restrictions upon the use of inculpatory circumstantial evidence is elementary. For example, where circumstantial evidence consists in reasoning from a minor fact or series of minor facts to establish a principal fact, the process is fatally vicious if the circumstances, from which an attempt is made to deduce a conclusion of guilt, depends upon speculation and conjecture.

*State v. Waltz,* 237 Minn. 409, 415–16, 54 N.W.2d 791, 796 (1952) (emphasis omitted) (footnotes omitted); *see also Stein,* 776 N.W.2d at 723 (Meyer, J., concurring) (noting that since at least 1869, Minnesota courts instructed the jury on the law of circumstantial evidence).

In *Holland v. United States,* the U.S. Supreme Court determined that a proper reasonable-doubt instruction obviated the need for a rational-hypothesis instruction:

The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions, but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect.

348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (citations omitted). Citing *Holland,* "we eventually abandoned the special jury instruction." *Stein,* 776 N.W.2d at 723 (Meyer, J., concurring).[2]

"The standard of proof beyond a reasonable doubt ... 'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding." *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (quoting *Winship,* 397 U.S. at 363, 90 S.Ct. 1068). "At the same time, by impressing upon the factfinder the need to

2. The *Holland* court believed that a special jury instruction would be confusing because testimonial evidence is no different from circumstantial evidence. There is, however, a distinction between the two categories: With regard to the former, the jury must determine whether the particular assertion is true, whereas in the latter case, the jury must not only decide whether it is true, but also whether guilt logically can be inferred from such evidence.
*Tscheu,* 758 N.W.2d at 870 n. 3 (Meyer, J., concurring) (citations omitted) (internal quotation marks omitted).

reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself." *Id.*

Minnesota's pattern reasonable-doubt jury instruction reads:

> Proof beyond a reasonable doubt is such proof as ordinarily prudent men and women would act upon in their most important affairs. A reasonable doubt is a doubt based upon reason and common sense. It does not mean a fanciful or capricious doubt, nor does it mean beyond all possibility of doubt.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.03 (5th ed. 2006). This instruction neither incorporates the *Winship* concept of impressing upon the jury the need to reach "a subjective state of certitude," 397 U.S. at 364, 90 S.Ct. 1068, nor *Jackson's* less rigorous "subjective state of near certitude." 443 U.S. at 315, 99 S.Ct. 2781. In addition, "[t]he result of focusing the jury on the notion of reasonable doubt is that once the government puts on a case, even a weak one, it appears to be up to the defendant to rebut it." Lawrence M. Solan, *Convicting the Innocent Beyond a Reasonable Doubt: Some Lessons About Jury Instructions from the* Sheppard *Case,* 49 Clev. St. L.Rev. 465, 481 (2001). And instructions that spend time

> explaining to jurors what should not count as a reasonable doubt, and making sure that jurors do not take the concept of reasonable doubt too far ... add[ ] to the burden that a defendant must meet when the government has a fairly weak case based on circumstantial evidence, and the defendant does not have any good alternative explanations of what

happened because he wasn't there and didn't commit the crime.

*Id.* at 484.

Moreover, the analogy of proof beyond a reasonable doubt to decisions people act upon in their own most important affairs is misplaced:

> In the decisions people make in the most important of their own affairs, resolution of conflicts about past events does not usually play a major role. Indeed, decisions we make in the most important affairs of our lives—choosing a spouse, a job, a place to live, and the like—generally involve a very heavy element of uncertainty and risk-taking. They are wholly unlike the decisions jurors ought to make in criminal cases.

*Victor v. Nebraska,* 511 U.S. 1, 24, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (Ginsburg, J., concurring in part and concurring in the judgment) (internal quotation marks omitted) (quoting Fed. Judicial Ctr., *Pattern Criminal Jury Instructions* 29 (1987) (commentary on Instruction 21)); *see id.* at 34, 114 S.Ct. 1239 (Blackmun, J., concurring in part, dissenting in part) (noting agreement with Justice Ginsburg's observation on misplaced analogy to "frequently high-risk personal decisions people must make in their daily lives").

In addressing potential juror confusion and misunderstanding posed by instructions similar to Minnesota's reasonable-doubt formulation, a number of courts have turned to the Federal Judicial Center's instruction, which reads:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that

overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

Fed. Judicial Ctr., *Pattern Criminal Jury Instructions,* Instruction 21. *See, e.g., State v. Reyes,* 116 P.3d 305, 314 (Utah 2005) (authorizing use of the model Federal Judicial Center instruction); *see also* R. Jason Richards, *Reasonable Doubt: An Overview and Examination of Jury Instructions in Colorado,* Colo. Law., Aug. 2004, at 85, 88, 91 nn. 89–90 (citing federal and state courts approving model Federal Judicial Center instruction).

Justice Ginsburg endorsed the Federal Judicial Center instruction in her concurrence in *Victor,* 511 U.S. at 27, 114 S.Ct. 1239 (1994) ("This model instruction surpasses others I have seen in stating the reasonable doubt standard succinctly and comprehensibly."). Commentators find the Federal Judicial Center instruction superior to instructions similar to Minnesota's formulation. *See, e.g.,* Jon O. Newman, *Beyond "Reasonable Doubt,"* 68 N.Y.U. L.Rev. 979, 991 (1993) ("Notably absent from the [Federal Judicial Center's] model charge is the misleading phrase about a doubt 'based on reason' and the ambiguous language about 'hesitating on important matters.'"); Solan, *supra,* at 482–83 (citing study conducted by psychologist Irwin Horowitz and evidence scholar Laird Kirkpatrick in which "[o]nly the [Federal Judicial Center] instruction achieved acquittals when the case was weak, and convictions when the case was strong"); Richards, *supra,* at 88 (finding

Federal Judicial Center instruction "superior to the traditional formulations").

The evaluation of circumstantial evidence requires the jury to closely examine the evidence and determine what inferences can and should be drawn from a minor fact or series of minor facts to establish a principal fact. The rational-hypothesis instruction directs the jury's attention to the appropriate method for evaluating this evidence. Given the frailties in Minnesota's reasonable-doubt instruction, it would be difficult for me to conclude that the instruction qualifies as a proper one, sufficient to preclude the need for the rational-hypotheses instruction as contemplated in *Holland.* Now that appellate courts review only those circumstances implicit in the verdict, the special instruction on circumstantial evidence is essential to avert undermining the presumption of innocence and to impress upon the jury the need to reach a state of certitude of the guilt of the accused.

PAGE, Justice (concurring).

I join in the concurrence of Justice Meyer.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Meyer.