*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0329**

State of Minnesota,
Respondent,

vs.

Staci Jo Montgomery,
Appellant.

**Filed December 14, 2015
Affirmed in part, reversed in part, and remanded
Rodenberg, Judge**

Crow Wing County District Court
File No. 18-CR-13-5054

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Donald F. Ryan, Crow Wing County Attorney, Candace Prigge, Assistant County Attorney, Brainerd, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Suzanne M. Senecal-Hill, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Rodenberg, Judge; and Reilly, Judge.

## UNPUBLISHED OPINION

**RODENBERG**, Judge

Appellant challenges her conviction of interfering with a 911 call, arguing that the evidence of her guilt was insufficient. Because the circumstances proved at trial do not

exclude the reasonable hypothesis that appellant did not possess the requisite mental state, we reverse her conviction for interference with a 911 call, affirm her uncontested convictions, and remand for resentencing.

**FACTS**

At approximately 11:15 p.m. on December 14, 2013, appellant returned to the residence she shared with her 12-year-old daughter, B.K.W.; appellant's brother, B.T.W.; and appellant's parents, B.W. and T.V.W. She had been drinking alcohol. Appellant's parents and B.K.W. were in appellant's parents' bedroom when appellant arrived. Shortly after appellant's arrival, B.K.W. left the bedroom and confronted appellant about her failure to attend B.K.W.'s recent dance performance. Appellant and B.K.W. began playfully wrestling on the floor but it quickly got "kind of got rough." B.K.W. started crying and called out for her grandfather, T.V.W.

T.V.W. was "still half asleep" when he reached where appellant and B.K.W. were wrestling. T.V.W. told appellant to get off of B.K.W. Appellant refused, stating that she was B.K.W.'s mother and she would do what she wanted with her. T.V.W. pulled appellant off of B.K.W. Appellant, apparently intoxicated and angry, began swinging at T.V.W. and trying to slap him. B.T.W. pulled appellant away from T.V.W. by placing her in a "bear hug" and telling her to settle down. Appellant kicked B.T.W. and, according to B.T.W., she also urinated on him while telling him to release her. B.T.W. released appellant from the bear hug, and appellant again began swinging at T.V.W., following him as he retreated to the hallway toward a bathroom. T.V.W. sustained an

2

injury to his finger during the fighting. Appellant eventually went downstairs to change her pants.

At some point during all of this, B.W. told B.K.W. to "call the cops." B.K.W. yelled that she was calling 911, and did so using the kitchen cordless telephone. B.W. got on that same telephone line using the telephone in her bedroom and spoke with the 911 operator. At trial, B.T.W. testified that he knew B.W. was "on the phone with somebody" and that "it had to have been 911 or a sheriff's department or somebody, had to be somebody involved to get a cop there." T.V.W., who is hard of hearing, did not hear B.K.W. announce that she was calling 911 or see anyone on the telephone.

The Crow Wing County Sheriff's Department received and recorded two separate 911 calls from appellant's residence on December 14, 2013. Both recordings were received at trial.[1] During the 911 calls, loud shouting can be heard from several voices in the background. In addition to dialing 911, B.K.W. also called her brother on her cellular phone at some point during the mayhem. During the second 911 call, B.W. passed the telephone to B.K.W., who told the operator that appellant had made her "grandpa bleed and he's punching her."

Appellant attempted to take the telephone from B.K.W. during this second 911 call. B.K.W. screamed at appellant that she was on the telephone and told appellant to "get out." The operator told B.K.W. to lock the door, but appellant took the telephone

---

[1] Before jury selection, the prosecutor indicated that the recording was of a single 911 call. However, the operator during the first part of the recording has a male voice, then there is a clear break, and the second part begins with a female voice answering "911 Emergency."

3

from B.K.W.  Appellant can be heard on the recording to say, "Amanda?  Amanda?  Hello?"  Appellant disconnected the call when the operator said, "Hi, who is this?"  B.K.W. testified at trial that the reference to "Amanda" could have meant her cousin.

The complaint was amended several times and, after amendment, appellant was charged with:  interference with a 911 call in violation of Minn. Stat. § 709.78, subd. 2(1) (2012); domestic assault (intent to cause fear of bodily harm involving B.K.W.) in violation of Minn. Stat. § 609.2242, subd. 1(1) (2012); domestic assault (attempt to inflict bodily harm involving T.V.W.) in violation of Minn. Stat. § 609.2242, subd. 1(2) (2012); and two counts of disorderly conduct in violation of Minn. Stat. § 609.72, subd. 1(1), (3) (2012).  The case was tried to a jury, which found appellant guilty of domestic assault with intent to cause fear of bodily harm, interference with a 911 call, and one count of disorderly conduct.  The jury found appellant not guilty of the remaining two charges.  The district court sentenced appellant to one year in jail on the interference-with-a-911-call conviction, stayed execution of the sentence, and placed appellant on probation for a term not to exceed two years.  Appellant was not sentenced on the other convictions.  This appeal followed.

## DECISION

Appellant argues on appeal that the evidence is insufficient to sustain her conviction for gross-misdemeanor interference with a 911 call.  She does not challenge her convictions of domestic assault with intent to cause fear of bodily harm or of disorderly conduct.  We therefore affirm those convictions.

Minn. Stat. § 609.78, subd. 2(1), under which appellant was convicted, provides

4

> Whoever does the following is guilty of a gross misdemeanor: (1) intentionally interrupts, disrupts, impedes, or interferes with an emergency call or who intentionally prevents or hinders another from placing an emergency call . . . .

An emergency call is defined as: "(1) a 911 call; (2) any call for emergency medical or ambulance service; or (3) any call for assistance from a police or fire department or for other assistance needed in an emergency to avoid serious harm to person or property." *Id.*, subd. 3 (2012). The amended complaint specifies that the call with which appellant interfered was a "911 call."

In order to be guilty of intentionally interfering with a 911 call, a defendant must know that a call is a 911 call. *See* Minn. Stat. § 609.02, subd. 9(3) (2014) (requiring that, for the state to prove intent, the "actor must have knowledge of those facts . . . necessary to make the actor's conduct criminal); *State v. Hersi*, 763 N.W.2d 339, 345 (Minn. App. 2009). Appellant does not dispute that she interfered with a telephone call when she took the telephone from B.K.W. The sole issue raised on appeal is whether the evidence is sufficient to prove that appellant knew that she was interfering with a 911 call.

On review of a sufficiency-of-the-evidence claim, we thoroughly review the record to determine whether the evidence, when viewed in a light most favorable to the conviction, is sufficient to permit the jurors to reach a guilty verdict. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We assume that the jury believed evidence that supports the verdict and disbelieved conflicting evidence. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989).

Appellant argues, and respondent does not dispute, that the evidence concerning appellant's intent is entirely circumstantial. *See State v. Davis*, 656 N.W.2d 900, 905 (Minn. App. 2003) (stating that "[t]he intent element of a crime, because it involves a state of mind, is generally proved circumstantially"), *review denied* (Minn. May 20, 2003). We apply heightened scrutiny when reviewing a verdict based on circumstantial evidence. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). The circumstances proved must be consistent with guilt and inconsistent with any other rational hypothesis. *Id.* "Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotation omitted). If the circumstances proved are consistent with reasonable hypotheses of both guilt and innocence, then there is a reasonable doubt regarding guilt. *Id.* at 474.

Minnesota appellate courts employ a two-step process when reviewing convictions based on circumstantial evidence. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010). First, we identify the circumstances proved. *Id.* In doing so, we view the evidence in the light most favorable to the verdict. *See Pratt*, 813 N.W.2d at 874 (stating that the court considers the evidence "in the light most favorable to the verdict" when determining the circumstances proved). We defer to the fact-finder's acceptance and rejection of proof and to its credibility determinations. *Andersen*, 784 N.W.2d at 329; *see also State v. Hughes*, 749 N.W.2d 307, 312 (Minn. 2008) (stating that juries are "in the best position

to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony").

Next, we examine the reasonable inferences that can be drawn from the circumstances proved. *Andersen*, 784 N.W.2d at 329. All of the circumstances proved must be consistent with guilt and inconsistent with any other rational hypothesis. *Id.* We do not defer to the fact-finder's choice between rational hypotheses. *Id.* at 329-30. However, a rational hypothesis negating guilt must be based on more than mere conjecture or speculation. *Al-Naseer*, 788 N.W.2d at 480; *Andersen*, 784 N.W.2d at 330.

Viewing the evidence in the light most favorable to the jury's guilty verdict, the following circumstances are proved: Appellant and B.K.W. wrestled after B.K.W. confronted her about missing B.K.W.'s dance performance; B.K.W. called for help from her grandfather, T.V.W.; T.V.W. and appellant were yelling and fighting as they moved from the living room into the hallway and bathroom; B.K.W. yelled that she was calling 911 and dialed the number on the kitchen cordless telephone; B.W. got on the same telephone line from her bedroom telephone; B.K.W. also called her brother on her cellular phone; B.W. spoke with two 911 operators in her bedroom and eventually passed the telephone to B.K.W.; appellant tried to get the telephone away from B.K.W. and was told by B.K.W. to "go away"; appellant took the telephone away from B.K.W. and said "Amanda? Amanda? Hello?" into the telephone and disconnected the call when the operator asked, "Hi, who is this?"; and one of B.K.W.'s cousins is named "Amanda."

The state argues that "[g]iven the nature of the incident that was occurring, [B.K.W.'s] side of the conversation and the fact that [appellant] disconnected the call as

soon as the dispatcher asked who she was, is sufficient evidence for the jury to conclude [appellant] knew [B.K.W.] was making an emergency call." However, two inferences can reasonably be drawn from the circumstances proved: (1) appellant intended to interfere with what she knew to be B.K.W.'s 911 call; and (2) appellant intended to interfere with B.K.W.'s telephone call to some unknown person, perhaps a cousin named Amanda.

Both hypotheses are reasonable. The first was accepted by the jury; but the second hypothesis is also reasonable. Appellant and T.V.W. were fighting in the hallway and bathroom when B.K.W. yelled that she was calling 911 and dialed the number on the kitchen telephone; B.W. spoke with two 911 operators and B.K.W. spoke with her brother on her cellular phone before also speaking with the 911 operator during a second call to 911; B.K.W. did not identify the person with whom she was speaking during the recording; and appellant stated the name "Amanda" after she seized the telephone from B.K.W. This second hypothesis is not based on mere conjecture or speculation, and it negates the intent necessary to make appellant guilty of interfering with a 911 call. *See Al-Naseer*, 788 N.W.2d at 480 (stating that "a defendant is not relying on conjecture or speculation when [he] points to evidence in the record that is consistent with a rational theory other than guilt") (quotation omitted).

The state argues that "the fact that [appellant] disconnected the call as soon as the dispatcher asked who she was, is sufficient evidence" for the jury to convict. But the state was required to prove that appellant had the intent to interfere with a 911 call at the time she that interfered by taking the telephone from B.K.W. Minn. Stat. § 609.78, subd.

8

2(1).  Essentially conceding the reasonableness of the alternative hypothesis, the state acknowledges that appellant could have thought that B.K.W. was speaking with "Amanda" but alleges that even if she thought that, appellant "clearly knew [B.K.W.] was making the call to try to get help to the residence during the emergency and keep [appellant] from interfering with that call."  But the statute's definition of an "emergency call" does not include such a situation.  A telephone call to a cousin named "Amanda" would not qualify as a call for "any call for assistance from a police or fire department or for other assistance needed in an emergency to avoid serious harm to person or property." *Id.*, subd. 3.  And the complaint specifically alleged interference with a "911 call."

Because the circumstances proved at trial are consistent with a rational hypothesis inconsistent with appellant's guilt, her conviction must be reversed.  The remaining convictions, unchallenged on appeal, are affirmed, and we remand to the district court for resentencing.

**Affirmed in part, reversed in part, and remanded.**