**STATE of Minnesota, Respondent,**

v.

**Michael Elwin PERO, Appellant.**

**No. C0–98–681.**

Supreme Court of Minnesota.

March 11, 1999.

---

John M. Stuart, Minnesota State Public Defender, Lawrence Hammerling, Deputy State Public Defender, Minneapolis, for appellant.

Alan Mitchell, St. Louis County Attorney, Gary W. Bjorklund, Assistant St. Louis County Attorney, Duluth, for Respondent State of Minnesota.

M. Hatch, Minnesota State Attorney General, Mark B. Levinger, Assistant Attorney General, St. Paul, for Respondent Terry C. Hallenbeck.

## OPINION

BLATZ, Chief Justice

Appellant, Michael Elwin Pero, was initially charged by complaint with two counts of second-degree murder (causing death while committing kidnapping or false imprisonment) and one count of attempted first-degree sexual conduct (causing injury and using force or violence to accomplish sexual penetration). The charges arose out of appellant's criminal behavior beginning September 26, 1996, when appellant admittedly kidnapped, imprisoned, sexually assaulted, and eventually killed Michael Dean King. On February 19, 1997, the St. Louis County Grand Jury indicted appellant for first-degree murder (causing death during sexual assault committed with force or violence) and two counts of second-degree murder.

Appellant and the state reached a plea agreement, which was offered to the trial court on March 9, 1998. Under the terms of the plea agreement, appellant was to plead guilty to second-degree felony murder (causing death while committing false imprisonment). In exchange for his plea, appellant would receive a 480 month sentence and the indictment and all other charges would be dismissed. On March 17, 1998, the trial court issued an order denying the dismissal of the first-degree murder indictment and rejecting the plea agreement. The appellant and state then filed a joint motion requesting that the trial judge recuse himself, which the trial judge denied.

Appellant subsequently filed a petition for a writ of mandamus with the court of appeals, ordering the trial court to dismiss the first-degree murder indictment, or in the alternative, a writ of prohibition ordering the trial judge to recuse himself. The state joined appellant's petition, and the trial judge filed a pro se response. On May 13, 1998, the court of appeals denied the writs. We granted appellant's petition for review, which was also joined by the state, and must now determine if the court of appeals erred in denying the writs.

The facts underlying this appeal are not in dispute. Appellant first met the victim, Michael King, at approximately 3:00 a.m. on Thursday, September 26, 1996. Appellant had just left a bar when he saw King waiting at a bus stop on Superior Street in Duluth. Appellant approached King and invited him back to his house and King accepted the invitation. At that time, appellant told King that he was gay. Once they were in appellant's house, appellant and King looked at some "bondage" magazines, and King told appellant that he would like to try bondage "a little bit later." Appellant then offered King a soda pop, which King accepted. King did not know that appellant had put approximately six sleeping pills in the soda pop, in hopes of "knock[ing] [King] out."

Eventually, appellant and King laid down on appellant's bed. While King was still clothed, appellant laid naked next to King, waiting for the drugs to put King to sleep. Once the drugs took effect and King was asleep, appellant took King's clothes off, leaving only King's shirt on his body. Appellant then tied King's hands behind his back with an Ace bandage, wrapped duct tape around King's mouth, and put a black hood over King's head. Appellant's intent at this time was to "keep [King] for awhile," to "make [King] secure so he can't move and then probably put him in the closet * * *." Appellant wanted to "keep [King] for sexual bondage pleasures." Appellant also planned on "brainwashing" King by playing tape recordings at the same time he deprived King of food and water. Appellant believed that it would take four to six months to make King "submissive * * * * for sexual purposes," and appellant was willing to keep King captive for that period of time.

After appellant duct taped King's mouth, King awoke and attempted to remove the tape, saying that he could not breathe. Appellant got behind King and put a black leather dog collar on King to keep King quiet. King began to struggle, and appellant admits that at this point he was aware that King was not consenting to the situation. Undeterred, appellant duct taped King's ankles and hit him on the head several times with a broomstick "to knock him out." In addition to rendering King unconscious, the blows from the broomstick caused King's head to bleed.

When King awoke, he began to struggle, and banged his head against a wall and window, breaking the window and again causing his head to bleed. Appellant covered King's nose and mouth with his hands, attempting to "knock him out through suffocation." Appellant was successful and King again lost consciousness. Appellant then checked King for a pulse and listened to his heartbeat with a stethoscope. When appellant determined that King was still alive, he duct taped King's head to stop the bleeding. Appellant then put him in a closet and hog-tied King.

Shortly thereafter, appellant left for work. He was at work from 10:00 p.m. on Thursday until 6:00 a.m. Friday. Appellant did not check on King until approximately 2:30 p.m. Friday afternoon. Upon opening the closet, appellant found that King was "cold" and "discolored." Using a stethoscope, appellant concluded that King was dead.

After discovering that King was dead, appellant cut off King's hair "to help in decomposition," tied a sock around his mouth, tied some ropes around him, and put him in a cardboard box. Appellant purchased a two-wheeled dolly from K–Mart that he used to load the deceased, boxed and bound, into his car. Appellant left the box holding King in the backseat of his car for two days. Eventually, appellant drove his car to his father's farm in Lakewood Township, St. Louis County. It was there that appellant partially buried the box, along with some of King's possessions. Appellant kept King's driver's license because he wanted a picture of King.

Eventually, appellant's father discovered the partially buried box on his property and reported his discovery to the local police. On December 1, 1996, the police first spoke to appellant. Appellant denied any knowledge of the body that was found on his father's property. However, when the police obtained a search warrant and again interviewed appellant on December 13, 1996, appellant gave the police a lengthy statement describing his actions that led to King's death. Appellant was then indicted on February 19, 1997, by a St. Louis County Grand Jury for first-degree murder, Minn.Stat. § 609.185(2) (1998), and two counts of second-degree murder, Minn.Stat. § 609.19, subd. 2(1) (1998).

On March 9, 1998, appellant pleaded guilty to one count of second-degree murder and agreed to a 480 month sentence, the statutory maximum. In return for his guilty plea, the state agreed to dismiss the other charges, including first-degree murder. After the parties presented the plea agreement to the court, the court requested that the parties present the specific reasons why the plea agreement was in the public interest.

The state first responded by informing the court that the agreement had been reached after numerous discussions between the par-

ties, and noted that the agreement had been discussed with the law enforcement agencies involved in the case as well as the victim's family. The state indicated to the court that the law enforcement agencies approved of the plea agreement, but that the victim's family wanted appellant to "face the maximum penalty provided by law." The state then told the court that the agreement was in the public interest because of the ever present risk of the appellant being acquitted of first-degree murder.

When the court asked what specific elements of the state's case were causing concern, the state responded that it would have difficulty establishing the exact time and cause of death. The state was concerned that this would make it difficult to prove that appellant caused King's death while committing or attempting to commit criminal sexual conduct with force or violence, a required element of the first-degree murder charge.

The state then admitted that appellant had already expressed a willingness to "accept responsibility" for the two counts of second-degree murder, either at the present hearing or at trial. Further, the state pointed out that the plea agreement provided for a significant upward departure from the sentencing guidelines for second-degree murder. Appellant was willing to agree to a sentence of 40 years, an upward departure from the presumptive sentence that the state acknowledged was a "rare occurrence."

On March 17, 1998, the trial court issued an order denying the dismissal of the first-degree murder indictment and rejecting the plea agreement. In its accompanying memorandum, the trial court stressed that the state had failed to provide a reasonable factual basis to warrant dismissal of the grand jury's indictment. While the court recognized the prosecutor's discretion, it also expressed concern for the integrity of the grand jury system and the statutory scheme for different degrees of murder.

Following the trial court's rejection of the plea agreement and denial of leave to dismiss the first-degree murder indictment, the appellant and state filed a joint motion requesting that the trial judge recuse himself, which the trial judge also denied. Appellant then filed a petition, later joined by the state, with the court of appeals for a writ of mandamus ordering the trial court to dismiss the first-degree murder indictment, or in the alternative, a writ of prohibition ordering the trial judge to recuse himself. The court of appeals denied the writs [1] and this appeal followed.

## I.

■ We first determine if the trial court erred in refusing to dismiss the indictment for first-degree murder and rejecting the plea agreement. Appellant brings this appeal seeking the remedy of mandamus. Mandamus is an extraordinary legal remedy.[2] To obtain a writ of mandamus, appellant must establish that the court had a clear and present official duty to perform a certain act.[3] If the court has discretion to perform the act, appellant "must establish that failure to perform it 'was so arbitrary and capricious as to constitute a clear abuse of discretion.' " [4]

Appellant argues that the trial court abused its discretion by refusing to accept the plea agreement. In refusing to accept the plea agreement, the trial court explicitly denied the prosecuting attorney leave to dismiss the indictment for first-degree murder. In reaching its decision, the trial court considered two Minnesota Rules of Criminal Procedure, 15.04, subd. 3, and 30.01.

■ Rule 15.04, subd. 3(1), requires that when a trial court is offered a plea agreement which incorporates a guilty plea, "the trial court judge shall reject or accept the plea of guilty on the terms of the plea agreement." The trial court "*may* accept a plea

1. *State v. Pero*, No. C0–98–681 (Minn.App. May 15, 1998) (unpublished order).

2. *McIntosh v. Davis*, 441 N.W.2d 115, 118 (Minn. 1989) (citing *State ex rel. Barnes v. Tauer*, 178 Minn. 484, 487, 227 N.W. 499, 500 (1929)).

3. *Id.*(citing *State ex rel. Brenner v. Hodapp*, 234 Minn. 365, 370, 48 N.W.2d 519, 522 (1951)).

4. *Id.* (quoting *Baker v. Connolly Cartage Corp.*, 239 Minn. 72, 74, 57 N.W.2d 657, 658 (1953)).

agreement of the parties when the interest of the public in the effective administration of justice would thereby be served."[5] The use of the term "may" provides the trial court with discretion in accepting a plea agreement. Further, two of our earlier decisions also support the premise that the trial court has discretion in accepting a defendant's plea.[6]

Rule 15.04 sets forth some considerations for the trial court in determining if the plea agreement should be accepted:[7]

(a) That the defendant by pleading guilty has aided in ensuring the prompt and certain application of correctional measures;

(b) That the defendant has acknowledged guilt and shown a willingness to assume responsibility for the criminal conduct;

(c) That the concessions will make possible the application of alternative correctional measures which are better adapted to achieving rehabilitative, protective, deterrent or other purposes of correctional treatment, or will prevent undue harm to the defendant;

(d) That the defendant has made trial unnecessary when there are good reasons for not having a trial;

(e) That the defendant has given or offered cooperation which has resulted or may result in the successful prosecution of other offenders engaged in serious criminal conduct;

(f) That the defendant by pleading has aided in avoiding delay in the disposition of other cases and thereby has contributed to the efficient administration of criminal justice.

■ In contrast to Rule 15.04, Rule 30.01 does not deal specifically with plea agree-

ments. Rather, Rule 30.01 permits the prosecuting attorney to dismiss a complaint or tab charge *without* leave of court, but only permits dismissal of an indictment *with* leave of court. We have recognized that the rule provides "a somewhat different standard * * * in those cases commencing upon the return of an indictment by the independently functioning grand jury. In that event, the grand jury has concluded that there exists probable cause that an offense has been committed and that the defendant committed it."[8]

■ In *State v. Aubol*, we noted that Rule 30.01 requires judicial scrutiny prior to dismissal of an indictment to insure that "the prosecutor has neither summarily ignored nor preempted the considered decision of the grand jury without a sufficient factual basis."[9] Thus, the trial court has discretion in granting leave to dismiss an indictment in order to protect the integrity of the grand jury system. The trial court "must grant leave to dismiss an indictment when the prosecutor has provided the court with a factual basis and the court is satisfied that the prosecutor has not abused its broad discretion."[10]

Requiring trial courts to apply both rules in the present case may seem illogical, given that rejecting the plea agreement and refusing to dismiss the indictment would, independently, have the same effect. However, there is a valid basis for this scheme, as the rules are based on independent judicial doctrines. Rule 30.01 protects the historically independent, judicial role of a grand jury.[11] The rule promotes the grand jury's role as an arm of the judiciary, " 'to stand between

**5.** Minn. R.Crim. P. 15.04, subd. 3(2) (emphasis added).

**6.** *See State v. Goulette*, 258 N.W.2d 758, 762 (Minn.1977) (holding that "[n]either the constitution nor our Rules of Criminal Procedure give to a criminal defendant an absolute right to have his plea of guilty accepted"); *see also State v. Linehan*, 276 Minn. 349, 353, 150 N.W.2d 203, 206 (1967) (holding that there is no "absolute right on the part of a defendant to plead guilty," but a court may, in its discretion, "allow [a defendant] to do so in proper cases").

**7.** Minn. R.Crim. P. 15.04, subd. 3(2)(a)-(f).

**8.** *State v. Aubol*, 309 Minn. 323, 329, 244 N.W.2d 636, 640 (1976).

**9.** *Id.*

**10.** *Id.*, 309 Minn. at 330, 244 N.W.2d at 640.

**11.** *See Hale v. Henkel*, 201 U.S. 43, 59, 26 S.Ct. 370, 50 L.Ed. 652 (1906) (grand jury historically served judicial function).

the prosecutor and the accused * * *.' "[12] In contrast, Rule 15.04 reflects case precedent holding that defendants do not have a constitutional right to have a guilty plea accepted.[13] The doctrines embodied in the two rules are independently important, and neither one can be ignored.

■ Having determined that the trial court properly referred to both rules in the instant case, we must next determine if the trial court abused its discretion in rejecting the plea agreement and in refusing to dismiss the indictment. The trial court considered both rules simultaneously, and discussed several factors in determining that the plea agreement was not in the public interest and that the state failed to provide a sufficient factual basis to dismiss the indictment.

First, the trial court noted that appellant's counsel indicated that appellant would "accept responsibility" for the two counts of second-degree murder even if the case proceeded to trial. While not expressly stating the meaning that the court was assigning to this fact, it appears that the court interpreted it as minimizing the risks for the state in going to trial.[14]

Second, in the trial court's view, appellant's own statements and admissions provided extremely strong evidence to support a conviction on both second-degree murder counts. Appellant admitted that he knew he was keeping King against his will, and that he intended to keep King for four to six months, depriving him of food and water, in an attempt to make him sexually "submissive."

Third, the trial court also noted for the record that appellant admitted suffocating King and leaving him hog-tied, and that two medical experts had determined that King's death was the result of a homicide, with the specific cause of death being suffocation or asphyxia. Therefore, in the trial court's

view, the state was merely getting a conviction in the plea agreement for a crime that appellant had already confessed to. In essence, the state had agreed to dismiss the indictment for first-degree murder to obtain a conviction of second-degree murder that was virtually guaranteed without a plea agreement.

When the state was asked by the trial court for its factual basis to support dismissal of the first-degree murder indictment pursuant to Minn. R.Crim. P. 30.01, the state responded that "[r]egardless of how strong you feel your initial case is, there is always a possibility, that should you go to trial, there is a chance that the defendant could be acquitted of the first count [of first-degree murder]." The state then noted that it could not establish King's time of death. The state argued that this would make it difficult to prove that appellant killed King while committing or attempting to commit criminal sexual conduct with force or violence.

The state's argument is not persuasive. Appellant's statements and admissions indicate that he killed King by suffocating him in an attempt to keep him captive, and that his purpose in keeping King captive was to make him "submissive * * * for sexual purposes." Appellant had already removed King's clothing, and admitted to getting sexual pleasure from King's bondage. A strong argument can be made that a jury would find that these facts support a first-degree murder conviction.

To support its contention that the plea agreement was in the public interest, pursuant to Minn. R.Crim. P. 15.04, subd. 3, the state argued that what it was really gaining in the plea agreement was nearly a triple upward departure in sentencing. The state contends that this significant upward departure would be warranted because of the heinous sexual nature of the crime. Arguably, it is the very factors that the state relies on in support of the upward departure that

---

12. *State v. Griese*, 565 N.W.2d 419, 430 (Minn. 1997) (Tomljanovich, J., dissenting) (quoting *Hale*, 201 U.S. at 59, 26 S.Ct. 370).

13. *See Goulette*, 258 N.W.2d at 762; *see also Linehan*, 276 Minn. at 353, 150 N.W.2d at 206.

14. Regardless of appellant's counsel's representations, trial strategy may change and such admissions by appellant may never materialize. In that case, appellant's statements from the plea hearing would not be admissible at trial. *See* Minn. R.Crim. P. 15.06 and Minn. R. Evid. 410.

would support a conviction of first-degree murder.

In its brief to this court, appellant further argues that the trial court's denial of leave to dismiss the indictment is an infringement of the separation of powers between the judiciary and the executive branch. Appellant claims that the trial court improperly involved itself in a decision that should be left to the prosecutor. However, we already expressed our concern that the grand jury not be seen as a tool of the prosecutor.[15] "The grand jury is not intended to be a tool of the prosecution or the defense. It is an arm of the judiciary and, as such, it shall be used in a fair, impartial and independent manner or not at all."[16] Further, appellant's argument ignores the separation of powers issue raised by allowing the parties' attorneys to force the trial court into a sentencing agreement. Sentencing is within the province of the judiciary, not the executive branch.

Minnesota Rules of Criminal Procedure 15.04, subd. 3, and 30.01 give the trial court discretion in determining if a plea agreement is in the public interest and if the state has established a sufficient basis to dismiss an indictment. The trial court properly applied these rules, and determined that the prosecuting attorney failed to establish a sufficient basis to dismiss the indictment and that the plea agreement was not in the public interest. While other trial judges may have reached different conclusions, nothing in the record indicates that the trial court abused its discretion in making these determinations.

## II.

■ We now consider appellant's alternative argument and determine if the trial judge erred in refusing to recuse himself. Appellant bases his argument on the advisory comment to Rule 15.04, subd. 3(1). The advisory comment states that:

Whenever the court rejects the plea agreement, whether on tender of plea or after receipt of the pre-sentence report, or after plea, the court shall so inform the defendant and give the defendant an opportunity to affirm or withdraw the plea, if entered, and *if the defendant has made factual disclosures tending to disclose guilt of the offense charged, the judge should disqualify himself or herself from the trial of the case.* [Emphasis added.]

■ It is not disputed that advisory comments are not binding.[17] Rather, the comments are recognized as providing guidance which courts may follow.[18] This is especially true when, as in the present case, the rule itself is clear and unambiguous.[19] Since the trial court was not required to follow the advisory comment, we must only determine if the trial court abused its discretion in not granting the motion for recusal.

Appellant contends that recusal is warranted because appellant admitted facts that disclosed his guilt at the plea hearing. However, appellant's testimony during the plea hearing provided little new evidence beyond what appellant had already told the police. As the state admitted, the two additional minor facts set forth during the plea hearing were: (1) that appellant used a stethoscope to monitor King; and (2) that a friend had come to his front door while King was being held captive. However, the state could not articulate the significance of these facts in disclosing appellant's guilt or prejudicing the trial judge.

Appellant also argues in its brief to this court that the trial judge should recuse himself because he has already made a judgment about appellant's guilt, as evidenced by the trial judge's memorandum accompanying the order rejecting the plea agreement. However, the trial judge's memorandum only referenced appellant's own statements that he intended to admit responsibility for second-degree murder. In addition, the trial judge also noted in his memorandum that the de-

15. *See State v. Johnson,* 441 N.W.2d 460, 466 (Minn.1989).

16. *Id.*

17. *See State v. Johnson,* 514 N.W.2d 551, 555 n. 8 (Minn.1994).

18. *Id.*

19. *See State v. Notch,* 446 N.W.2d 383, 386 (Minn.1989).

fendant was "being presumed innocent of all charges against him." Finally, should the case proceed to trial, the defendant will have the right to a jury of his peers who will be the triers of fact—not the judge.

The record supports a conclusion that what appellant really sought was a new judge to get a second chance at persuading the court to accept the plea agreement. As appellant's counsel stated at the recusal hearing, "I make no bones about it, if I am successful in getting this Court to disqualify himself [sic], I will again attempt to persuade another judge to dismiss the indictment * * *." The state, joining appellant's motion for recusal and the subsequent appeal, later admitted that appellant's goal was "judge shopping."

In summary, it is clear that the advisory comment, which recommends recusal following a rejected guilty plea, is not binding. Nonetheless, we recognize that the facts of a particular case may necessitate the recusal of a trial judge following a rejection of a guilty plea. However, considering the record in the present case, the trial court was within its discretion in deciding that recusal was not warranted.

Affirmed.

GILBERT, Justice (concurring specially).

While I concur with the result reached in this case, I write separately to express my concern about a trial court judge becoming an advocate at this court in a case presided over by that judge. The trial court judge in this case formally filed a pro se brief and has been personally represented by counsel. Such personal involvement by a trial court judge is concerning. While it is true that the trial court judge was named as a respondent in the writ of prohibition and writ of mandamus, it is not uncommon for a trial judge to be named as a party in an appellate action such as this. The only relief requested related to the trial court judge's official duties: no claims of a personal nature were put forth and no relief is sought from the trial judge personally.

In our review of cases such as this, we should take a careful look at the record developed at the trial court level. Therefore, even where both the prosecution and defense

are asking that the plea be accepted and/or the judge removed, a separate appearance by the trial court judge is not necessary. Instead, the trial court judge should make a complete record supporting his decision, including his factual findings and legal reasoning, accompanied by appropriate legal points of authority. The record should speak for itself.

This court apparently has never addressed the propriety of a trial court judge making a formal appearance in an appellate case involving one of that judge's decisions. Such an appearance is a significant departure from the normal role of an impartial judge. The issue of the standing of a trial court judge to respond directly and personally needs more study and should be reviewed by the Rules of Criminal Procedure Advisory Committee.