*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1471**

State of Minnesota,
Respondent,

vs.

Bradley Scott Junker,
Appellant.

**Filed September 8, 2015
Affirmed
Larkin, Judge**

Cottonwood County District Court
File No. 17-CR-13-377

Lori Swanson, Attorney General, Angela Behrens, Assistant Attorney General, St. Paul, Minnesota; and

Stephen J. Lindee, Watonwan County Attorney, St. James, Minnesota; and

Nicholas Anderson, Cottonwood County Attorney, Windom, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jenna Yauch-Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Chutich, Judge; and Smith, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges his terroristic-threats conviction, arguing that the district court erred by refusing to accept a plea agreement and that the evidence was insufficient to sustain the conviction. Appellant raises several additional issues in a pro se brief. Because the district court did not err by rejecting the plea agreement, the evidence was sufficient to sustain the conviction, and appellant's pro se arguments do not establish a basis for relief, we affirm.

## FACTS

In August 2013, respondent State of Minnesota charged appellant Bradley Scott Junker with two counts of making terroristic threats. One count involved L.B., an Assistant Cottonwood County Attorney, and the other count involved A.H., Junker's then girlfriend. Five days before Junker's scheduled trial in February 2014, the state proposed a plea agreement. Around 12:00 p.m. on the day before trial, Junker rejected the proposal. At a pretrial hearing later that day, which ended at 5:20 p.m., Junker maintained his innocence. Prospective jurors were scheduled to appear for orientation at 8:45 a.m. the following day, and the trial was scheduled to begin at 9:30 a.m.

That evening, Junker informed his attorney that he wanted to accept the state's proposed plea agreement. Junker's attorney "knew from past experience that [the district court judge] has a policy that he will not entertain any plea agreements on the day of trial." So, at approximately 8:00 p.m., Junker's attorney called the judge at his home and informed him that the parties had reached a plea agreement. The judge refused to accept

2

the plea agreement based on his policy and because the prospective jurors were scheduled to appear for jury duty the next day. Later, the district court noted that "counsel is always informed that a plea on trial day must be to all counts without agreement and further [that] a dismissal on trial day is with prejudice."

Junker's trial began the following morning. J.Q., a probation agent with the Minnesota Department of Corrections, testified that she supervised Junker for almost two years on probation. J.Q. stated that she spoke with Junker three times on August 20, 2013. J.Q. and Junker first spoke by telephone sometime before noon. Junker was upset about new criminal charges that he was facing. He said the charges were "bogus" and the fault of the prosecutor, L.B.

Later that day, J.Q. and Junker spoke at J.Q.'s office for approximately 30 minutes. Junker blamed L.B. for the new charges, said that he hated L.B. and that he wished another prosecutor was handling the case. According to J.Q., Junker said that he "wanted to shoot [L.B.] in the head" and that "[i]t would just be easier to just take care of it." J.Q. asked Junker if he had any weapons. Junker said that he did not, but he also said, "All I would have to do is make a phone call; I can get whatever I need. I just need to make one phone call." Immediately after Junker left her office, J.Q. called L.B. and told her what Junker had said. J.Q. also reported the incident to the police.

J.Q. saw Junker again around 4:30 p.m. outside of her office building. Junker had just left a court hearing and was more agitated than earlier. Junker had read a report regarding his new charges. He stated that he "thought that the consequences to his actions did not matter at that point." Before he left, Junker stated, "I don't know if I am

3

going to make it through the night." J.Q. once again reported Junker's statements to the police.

Junker testified on his own behalf and admitted that he told J.Q. that "[t]he b-tch [(L.B.)] ought to be shot for what she just done to me." He admitted that he repeatedly said that L.B. should be shot, but he denied saying that he should or would shoot L.B.

The jury found Junker guilty of the terroristic-threats charge involving L.B. and not guilty of the terroristic-threats charge involving A.H. The district court sentenced Junker to serve 24 months in prison.

Junker appeals.

## DECISION

## I.

Junker contends that the district court violated Minnesota Rule of Criminal Procedure 15.04 by refusing to consider the parties' plea agreement on its terms. This court reviews a district court's refusal to accept a plea agreement for an abuse of discretion. *See State v. Pero*, 590 N.W.2d 319, 325 (Minn. 1999) (determining whether the district court abused its discretion by refusing to accept a plea agreement).

"When a plea is entered and the defendant questioned, the trial court judge must reject or accept the plea of guilty on the terms of the plea agreement." Minn. R. Crim. P. 15.04, subd. 3(1). "If the court rejects the plea agreement, it must advise the parties in open court and then call upon the defendant to either affirm or withdraw the plea." *Id.* The district court "may accept a plea agreement of the parties when the interest of justice would be served." Minn. R. Crim. P. 15.04, subd. 3(2). The procedural rules provide a

nonexclusive list of appropriate considerations for use when determining whether to accept a plea agreement. *Id.* "Rule 15.04 reflects case precedent holding that defendants do not have a constitutional right to have a guilty plea accepted." *Pero*, 590 N.W.2d at 325; *see also State v. Goulette*, 258 N.W.2d 758, 762 (Minn. 1977) ("Neither the constitution nor our Rules of Criminal Procedure give to a criminal defendant an absolute right to have his plea of guilty accepted.").

Junker contends that the district court "neither accepted nor rejected [his] plea agreement," but rather refused to consider the plea agreement on its terms and in doing so violated rule 15.04. Specifically, Junker argues that "[t]he rules do not contain any time limit on either plea negotiations or the consideration of a plea agreement by the district court," "[j]udges have no authority to refuse to consider a plea agreement," and "interests of timeliness and juror inconvenience are markedly different than the [appropriate] considerations" listed in rule 15.04, subd. 3(2). Junker's arguments are unavailing in light of this court's decision in *State v. Klug*, 839 N.W.2d 723 (Minn. App. 2013).

Klug was charged with two offenses and during the year that followed, he "periodically communicated with the prosecutor in an effort to reach a plea agreement." *Klug*, 839 N.W.2d at 725. On the morning of trial, Klug accepted the state's offer to dismiss one charge in exchange for a guilty plea to the other charge. *Id.* The district court had a "policy of not accepting plea agreements on the day of trial in an effort to reduce juror frustration and to increase trust and confidence in the judicial system." *Id.* at 726. Consistent with that policy, the district court refused to accept the plea agreement. *Id.* at 725.

On appeal to this court, Klug argued that the district court abused its discretion by declining to accept the plea agreement. *Id.* at 726. This court rejected Klug's argument and held that "a district court, as a function of its discretion over whether to accept a plea agreement under Minn. R. Crim. P. 15.04, subd. 3(2), may validly establish and enforce a discretionary practice of declining to accept a plea agreement presented on the day that a trial is to begin." *Id.* at 727. This court reasoned:

> The burdens on jurors are worthy of consideration by the courts and the parties to litigation. As the district courts of many jurisdictions do, the district court here adhered to its policy of not accepting plea agreements on the day of trial in an effort to reduce juror frustration and to increase trust and confidence in the judicial system.
>
> An appropriate consideration in determining whether to accept a plea agreement is whether the "defendant by pleading has aided in avoiding delay in the disposition of other cases and thereby has contributed to the efficient administration of justice." Minn. R. Crim. P. 15.04, subd. 3(2)(f). The district court's rejection of a plea agreement on the brink of trial speaks to this consideration . . . .

*Id.* at 726.

Junker argues that *Klug* is factually distinguishable because he "reached an agreement the day before trial and no jurors needed to wait for [him] to conclude negotiations." Junker's argument puts form over substance. Klug accepted the state's plea offer "[o]n the morning of trial, with the jury pool waiting for jury selection to begin." *Id.* at 725. Junker accepted the state's plea offer the night before trial after business hours. The difference between accepting a plea offer on the morning of trial, when the prospective jurors are at the courthouse waiting for trial to begin, and the night

6

before trial after the close of business, when court staff is not available to notify the prospective jurors that their service would not be necessary the following day, is not meaningful.[1]

Junker also argues that *Klug* did not address the precise issue raised in this appeal. Junker emphasizes that "Klug argued that the *rejection* of his plea agreement was an *abuse of discretion*," whereas he argues that "the refusal to consider his plea agreement on its terms—the absence of the exercise of discretion—violated the Rules of Criminal Procedure." Although Junker articulates his argument differently, the issue he raises does not materially differ from the issue in *Klug*. Moreover, this court did not base its decision in *Klug* on the district court's consideration of the plea agreement's terms. *See id.* at 726-27. We simply upheld the district court's practice of not accepting a plea agreement on the day of trial as a valid exercise of discretion, which is what the district court did in this case. *See id.* at 727.

Junker also argues that this court should "disregard *Klug* because it is incorrect." "Based on the principle of stare decisis, [Minnesota courts] are extremely reluctant to overrule our precedent and require a compelling reason to do so." *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 862 (Minn. 2011) (quotations and alteration omitted). The parties offer several policy-based arguments for and against the district court's practice of refusing to accept plea agreements on the day

---

[1] The one notable difference between the circumstances in *Klug* and those in this case is that Klug asserted that he was unaware that the district court would not accept any plea agreement on the day of trial. 839 N.W.2d at 726. Junker does not assert that he was unaware of the policy. Instead, as the state argues, Junker appears to have "gambled on the hope that the court would not actually enforce it."

of trial. This court's decision in *Klug* was based on two such policies: reducing juror frustration and increasing trust and confidence in the judicial system. 839 N.W.2d at 726. Junker does not offer a compelling basis to disregard this court's reasoning in *Klug* as "incorrect."

Lastly, Junker argues that the district court's refusal to accept the plea agreement violates the separation-of-powers doctrine.

> Generally, the constitution empowers the legislative branch to legislate or make the laws, the executive branch to execute or carry out the laws, and the judicial branch to interpret and enforce the laws. But under the constitution, no branch of government may usurp or diminish the powers committed to another co-equal branch of government.

*In re Welfare of J.J.P.*, 831 N.W.2d 260, 268 (Minn. 2013) (citations omitted).

Junker argues that the district court "effectively limited the state's authority to amend charges" and "commandeered the uniquely executive function of charging." But there is no indication that the state attempted to amend or dismiss the charges against Junker or that the district court refused to allow the state to do so. Although the district court refused to accept the parties' plea agreement on the day of trial, the state did not object. Thus, the purported separation-of-powers issue is not ripe for review. *See In re Travis*, 767 N.W.2d 52, 58 (Minn. App. 2009) ("If an issue involves only a hypothetical possibility, then the issue is not justiciable because neither the ripe nor the ripening seeds of a controversy are present." (Quotation omitted.)); *Pechovnik v. Pechovnik*, 765 N.W.2d 94, 97 (Minn. App. 2009) ("Appellate courts decide only actual controversies and avoid advisory opinions." (Quotation omitted.)).

In sum, under this court's holding in *Klug*, the district court did not violate rule 15.04 or otherwise abuse its discretion by refusing to accept Junker's plea agreement.

**II.**

Minn. Stat. § 609.713, subd. 1 (2012), provides that a person commits the offense of terroristic threats if he "threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another or . . . in a reckless disregard of the risk of causing such terror." For the purpose of section 609.713, a threat is "a declaration of an intention to injure another or his property by some unlawful act. The test of whether words or phrases are harmless or threatening is the context in which they are used." *State v. Schweppe*, 306 Minn. 395, 399, 237 N.W.2d 609, 613 (1975) (citations omitted). "Thus the question of whether a given statement is a threat turns on whether the communication in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *Id.* (quotation omitted).

Junker argues that his "statement about L.B. does not, as a matter of law, constitute a terroristic threat" because "the terroristic threats statute does not criminalize statements of transitory anger." Junker further argues that "[w]hen a defendant argues that the charged statute does not prohibit his alleged conduct, the issue is one of statutory interpretation rather than sufficiency of the evidence, and the standard of review is de novo." *See State v. Colvin*, 645 N.W.2d 449, 452 (Minn. 2002) (determining, de novo, whether intent to violate an order for protection was sufficient to establish burglary, absent the commission of or intent to commit any other crime).

9

Caselaw establishes that "[t]he terroristic-threats statute is not intended to authorize grave sanctions against the kind of verbal threat which expresses *transitory anger* which lacks the intent to terrorize." *State v. Smith*, 825 N.W.2d 131, 137 (Minn. App. 2012) (quotation omitted), *review denied* (Minn. Mar. 19, 2013). It is therefore unnecessary for this court to interpret the terroristic-threats statute when considering Junker's argument that his statements were noncriminal expressions of transitory anger. Whether Junker's statements merely expressed transitory anger or constituted a threat under the terroristic-threats statute was an issue of fact for the jury. Our review of the jury's resolution of that issue is based on the sufficiency of the evidence. *See id.* (applying sufficiency analysis and rejecting defendant's argument that his conduct was merely the result of transitory anger); *State v. Jones*, 451 N.W.2d 55, 63 (Minn. App. 1990) (applying sufficiency analysis and concluding that "it would be possible for a reasonable jury to conclude that [the defendant] was not expressing 'transitory anger' when he threatened [two individuals], but that when doing so he had the requisite intent to terrorize necessary to support his conviction"), *review denied* (Minn. Feb. 21, 1990).

When reviewing a jury verdict, an appellate court considers whether the legitimate inferences drawn from the evidence would permit a jury to conclude that the defendant was guilty beyond a reasonable doubt. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). Review is limited to a close analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jury to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). The reviewing court must assume "the jury believed the state's witnesses and

10

disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). The reviewing court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

An appellate court applies heightened scrutiny when reviewing a verdict based on circumstantial evidence. *Pratt*, 813 N.W.2d at 874. Minnesota courts employ a two-step process when reviewing convictions based on circumstantial evidence. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010). First, the reviewing court identifies the circumstances proved. *Id*. Next, the reviewing court examines the reasonableness of the inferences that can be drawn from the circumstances proved, including inferences of innocence, as well as guilt. *Id*. All of the circumstances proved must be consistent with guilt and inconsistent with any other rational hypothesis negating guilt. *Id*. at 330.

Junker and the state apply the circumstantial-evidence standard of review to analyze the sufficiency of the evidence in this case. For the purpose of our analysis, we will assume that the circumstantial-evidence standard of review is the appropriate standard. We also accept Junker's description of the circumstances proved, which follows:

> Junker spoke to [J.Q.] on August 20th. Junker first spoke to her over the phone and later to [her] in person. Junker was upset because L.B. had filed new criminal charges against him that he believed had been resolved over a year prior. Junker expressed his frustration to [J.Q.]. His speech was "pressured" and he seemed agitated. Junker stated either that he wanted to shoot L.B., that he could, would, or should shoot

her, or that she ought to be shot. [J.Q.] asked Junker if he had weapons and Junker responded that he did not, but he would only have to make a phone call to get what he needed. Junker "babbled on" in their conversation but [J.Q.] allowed Junker to leave without addressing his statements about L.B. [J.Q.] did not detain Junker or prevent him from attending his hearing. [J.Q.] was aware that Junker was on his way to court where he might encounter L.B. After Junker left, [J.Q.] reported Junker's statement to L.B. and to law enforcement.

Junker argues that none of his reported statements constitutes a threat. He emphasizes that he never said he was "going to" shoot L.B., that he did not have a plan to hurt L.B., and that his statements were brief, not repeated, and not made directly to L.B. He further argues that he was just "spouting off, venting, and expressing his frustrations to a trusted confidant." However, no specific language or conduct is required for a statement to constitute a threat; the focus is on the context in which the statement was made. *See Schweppe*, 306 Minn. at 399, 237 N.W.2d at 613. Junker's statements were made in the following context. He was on probation. He was upset because he had been charged with new offenses. He expressed his frustration to his supervising probation officer over the phone and in person on the day of his court hearing. He directed his frustration at the prosecutor who filed the new charges. His expression of frustration progressed to multiple statements indicating his desire that the charging prosecutor be shot, stating that he could, would, or should shoot her. In addition, he claimed that he could obtain the necessary weapon with just one phone call. Given the context of Junker's statements, the circumstances proved do not support a reasonable inference that Junker was merely expressing transitory anger.

12

Junker also argues that the evidence was insufficient to prove that he intended to terrorize another or acted in reckless disregard of causing such terror. The state's case focused on Junker's reckless disregard of the risk of causing terror. "[D]eclaring the intent to injure by an unlawful act constitutes a terroristic threat when the person who utters the statement recklessly disregards the risk of terrorizing another." *State v. Bjergum*, 771 N.W.2d 53, 57 (Minn. App. 2009), *review denied* (Minn. Nov. 17, 2009). "Recklessness requires deliberate action in disregard of a known, substantial risk." *Id.* "By acting without regard to a known, substantial risk, a person's threats, however intended, may violate the statute." *Id.*

Junker contends that the "circumstances proved support a reasonable rational inference that [he] did not act . . . in reckless disregard of causing terror," and that "[i]t is equally plausible that [he] was merely venting to a trusted source, did not believe his statements would be repeated, and did not intend them to worry anyone."

A defendant "need not directly communicate the threat to the intended victim to be guilty of making a criminal threat." *Schweppe*, 306 Minn. at 401, 237 N.W.2d at 614; *see also* Minn. Stat. § 609.713, subd. 1 (stating that a terroristic threat may be made "directly or indirectly"). It is enough that the defendant "risked the danger that his threats would be communicated and thereby would terrorize [the victim]." *Schweppe*, 306 Minn. at 401, 237 N.W.2d at 614. And as the United States Supreme Court has stated:

> A probationer cannot pretend ignorance of the fact that his probation officer is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers. Absent some express or implied promise to the contrary, he may also be *charged with knowledge* that the probation

13

officer is duty bound to report wrongdoing by the probationer when it comes to his attention, even if by communication from the probationer himself.

*Minnesota v. Murphy*, 465 U.S. 420, 432, 104 S. Ct. 1136, 1145 (1984) (emphasis added) (citations and quotations omitted). Thus, Junker's hypothesis that he trusted J.Q. and did not think she would repeat his statements regarding L.B. is not rational, and it does not negate his guilt.

In sum, all of the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis negating guilt. We therefore do not disturb the jury's verdict.

## III.

Junker raises several issues in a pro se supplemental brief, including (1) the district court's refusal to accept his plea agreement; (2) the sufficiency of the evidence; (3) false testimony; (4) errors in a search-warrant application; (5) judicial bias; (6) jury tampering; (7) prosecutorial misconduct; (8) ineffective assistance of counsel; and (9) the district court's denial of his motion for a dispositional departure. The first two issues were addressed by Junker's appellate counsel, and Junker's arguments do not alter our decisions regarding those issues. We briefly address two of Junker's other pro se issues.

Junker contends that several state officials made false statements and gave false testimony at his trial. For example, he argues that J.Q. changed her story regarding what he said about L.B. Junker's allegations raise credibility issues. Credibility determinations are left to the jury. *State v. Reese*, 692 N.W.2d 736, 741 (Minn. 2005). In

14

his closing argument, Junker noted that J.Q.'s statements had "fluctuated." The jury's verdict reflects its assessment of that argument, and we defer to its assessment.

Junker also contends that he received ineffective assistance of counsel at trial. To succeed on a claim of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 2064, 2068 (1984).

Junker argues that his attorney improperly adopted the state's language regarding his threatening statements, effectively conceding an element of the offense. But that strategy was consistent with Junker's theory of the case. In fact, Junker made his own closing argument and asserted that he made the statements in a moment of fleeting anger and therefore lacked the intent required for the crime of terroristic threats. Given Junker's defense strategy, he has not established that the alleged concession affected the outcome of the trial. He therefore is not entitled to relief. *See id.* at 694, 104 S. Ct. at 2068.

Junker also argues that his attorney failed to subpoena key witnesses. Appellate courts "give trial counsel wide latitude to determine the best strategy for the client." *State v. Nicks*, 831 N.W.2d 493, 506 (Minn. 2013). Generally, the extent of any investigation, including calling prospective witnesses at trial, is part of trial strategy and "should not be readily second-guessed." *Id.* Minnesota caselaw includes many examples of cases holding that an attorney's decision regarding which witnesses to call is

unreviewable trial strategy.  *See, e.g.*, *State v. Jones*, 392 N.W.2d 224, 236 (Minn. 1986) (stating that decisions about "[w]hich witnesses to call at trial and what information to present to the jury are questions that lie within the proper discretion of the trial counsel"). Junker has not presented evidence or argument to show that his lawyer's decision regarding which witnesses to call was anything other than unreviewable trial strategy.

We have considered Junker's remaining pro se arguments and conclude that they do not provide a basis for relief.  *See Ture v. State*, 681 N.W.2d 9, 20 (Minn. 2004) (rejecting pro se arguments without detailing consideration of each argument).

**Affirmed.**